# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARIA ARENAS, individually, | § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No.  SA-16-CV-1203-XR |
| JOHN CALHOUN, in his individual capacity, | § § § § | |
| *Defendant*. | § | |

## ORDER

On this date, the Court considered the status of the above captioned-cased. After careful consideration, the Court hereby DENIES Plaintiff's Motion to Strike (Docket no. 46) and GRANTS Defendant's Motion for Summary Judgment (Docket no. 34).

## BACKGROUND

**I.  Factual Background**

Plaintiff Maria Arenas is the mother of Richard Tavera, deceased. Docket no. 1 at 1. Tavera had a history of severe mental illness, including civil commitment and attempted suicide. *Id.* at 2–3. On December 7, 2014, Tavera, while incarcerated at Smith State Prison in Tattnall County Georgia, took his own life. *Id.* at 2.

Defendant John Calhoun was employed as a correctional officer by Smith State Prison at the time of the incident. *Id.* at 1. Plaintiff alleges that Defendant witnessed Tavera attempting to hang himself by tying one end of his bedsheet around a sprinkler on the ceiling of his cell and the other end around his neck. *Id.* at 3. Plaintiff alleges that, although Defendant saw Tavera

1

beginning to take his own life, Defendant did not intervene to save him, and instead he stood back and watched. *Id.* Plaintiff alleges that Defendant called other officers, but that Defendant and the three other officers who appeared did not open the door until seven minutes after Tavera began his suicide attempt. Plaintiff alleges that Defendant did not contact EMS until at least fifteen minutes after he first witnessed Tavera attempting to hang himself and that EMS did not arrive at the prison until over thirty minutes after Defendant first saw Tavera beginning to hang himself. *Id.*

Defendant argues that he did not believe, and had no reason to believe, that Tavera was suicidal prior to the suicide. Docket no. 34 at 1. Defendant also argues that after he discovered Tavera attempting suicide, he immediately called for backup, obtained a key to the cell, and entered the cell after his supervisors determined it was safe to enter. *Id.*

Defendant states that when Tavera entered the Georgia prison system, he was given a routine diagnostic physical exam. *Id.* at 4. Although the records did not indicate that Tavera was taking any medications or having any active physical problems other than a sinus infection, toothache, and bleeding gums, the records did indicate that he had a history of mental illness and attempted suicide. *Id.* Subsequently, a psychologist conducted an evaluation on January 7, 2013, and found that Tavera had not taken any medication in the previous two years and "appears stable at this time." *Id.* The psychologist classified Tavera as a "Level I" mental health inmate, which Defendant states means no mental health services were needed. When Tavera was transferred to Smith State Prison ("SSP"), where he hanged himself, the intake sheet indicates that Tavera "had no chronic medical problems," was taking no medication, and was not a mental health patient. *Id.* at 5.

Defendant states that on December 6, 2014, the day before Tavera's suicide, the SSP medical staff examined Tavera for complaints of chest pain. *Id.* Tavera was reportedly "very uncooperative" during the assessment and refused to identify his pain level. *Id.* A nurse gave Tavera a sternum rub, notified a doctor of the issue, and submitted a referral for an EKG. *Id.* After the exam, Defendant alleges that Tavera refused to go to the hospital and refused to return to his general population dorm. *Id.* Tavera was then sent to an administrative segregation dormitory, "pending an investigation into his refusal to return to general population." *Id.* The cell was a single-man cell with a small window in the cell door. *Id.*

Defendant alleges that he began his shift on December 7, 2014, at around 6:00 p.m. *Id.* Prior to this shift, Defendant alleges he had never seen Tavera or interacted with him. *Id.* Defendant alleges he had no knowledge of Tavera's attempted suicide in 2008, his mental illnesses, or why Tavera was in administrative segregation, other than the fact that the sheet outside of Tavera's cell stated "pending investigation." *Id.* at 6. Plaintiff alleges that Defendant knew that Tavera was "depressed" and had been in solitary confinement for several days. Docket no. 39 at 3.

Defendant states he conducted rounds in the dormitory every thirty minutes, as required by Georgia Department of Corrections ("GDOC") policy. Docket no. 34 at 6. During one of those rounds, Defendant allegedly asked Tavera how he was doing, but Defendant does not recall Tavera's exact response. *Id.* Defendant, however, states that "nothing about the response caused him any concern or caused him to believe Tavera might be suicidal." *Id.* Plaintiff, on the other hand, states that when Defendant first observed Tavera, he spoke with Tavera and observed him to appear "depressed just by his demeanor." Docket no. 39 at 6.

3

Defendant, based on surveillance video of the prison facility, states that at 22:49 that night, he looked through the window in Tavera's cell door and saw a sheet, with one end tied around a sprinkler head and the other end tied around Tavera's neck. Docket no. 34 at 6; Prison Video at 22:49. Defendant alleges that he was unable to see Tavera's feet through the window and did not know if Tavera's feet were on the bed, a pile of books, "or any other object that would have kept him from actually hanging." Docket no. 34 at 6. Defendant argues he did not know whether the suicide attempt was "fake" or "genuine." *Id.* at 6–7.

Defendant alleges that, upon observing the scene, he immediately called for backup assistance on his radio four times. *Id.* at 7. Defendant states Officer Adam Haas responded to his fourth call, told Defendant assistance was on the way, and relayed the emergency to Defendant's supervisors. *Id.* Defendant then allegedly went to retrieve the key to the dormitory cells, but the officer on duty at the control room allegedly inadvertently gave Defendant the wrong key, of which Defendant was unaware at the time. *Id.*

Defendant states that at 22:53, he placed the key on his desk and wrote some notes, and one minute later, Sgt. Shelby arrived. *Id.*; Prison Video at 22:53:02. Defendant argues that Sgt. Shelby banged on the cell door and yelled at Tavera for a response for ten seconds. Docket no. 34 at 7. At this point, Officer Haas arrived at the dorm, and shortly thereafter, Lt. Dickson arrived. *Id.* at 8. Lt. Dickson allegedly looked in the cell, assessed the situation, and instructed the officers to open the cell door. *Id.* Defendant states that, following unsuccessful attempts to unlock the cell, he realized he must have the wrong key, and then ran back to the control room. *Id.* After Defendant returned with the correct key, the surveillance video shows that the cell door was opened at 22:56:07. Prison Video at 22:56:07. Defendant alleges he then entered the cell

4

with the other officers to remove Tavera from the noose and place him on the floor. Docket no. 34 at 8. Officer Haas and Sgt. Shelby allegedly took turns performing CPR, to no avail, while Lt. Dickson notified others, including EMS, about the suicide. *Id.*

Defendant states Sgt. Mitchell arrived with an AED unit, and the officers took turns using it on Tavera, to no avail. *Id.* at 8–9. EMS allegedly arrived at 11:19 p.m. *Id.* at 9. After Tavera was removed from the noose, Defendant allegedly operated a hand-held camera to capture the officers' actions in accordance with SSP policy. *Id.*

Defendant alleges that he did not enter Tavera's cell because it was unsafe and doing so would have violated GDOC policy. *Id.* Specifically, Defendant states that SSP has a policy and practice that forbids officers from entering an inmate's cell alone. *Id.* at 10. Officers must wait until a sufficient number of officers are present to safely enter the cell. *Id.* at 10–11. Although GDOC policy allows two officers to enter an administrative segregation cell, Defendant states that the actual practice is to wait until multiple officers are on the scene. *Id.* at 11.

Plaintiff, on the other hand, states that GDOC policy requires officers who come upon a suicide to "immediately cut down the hanging inmate." Docket no. 39 at 3. Plaintiff further argues that Defendant did absolutely nothing, other than talk on the radio and complete paperwork, after he found Tavera taking his own life and while he asphyxiated. *Id.* at 7. Plaintiff argues that Defendant did nothing until there were four officers present, did not enter the cell until seven minutes after Tavera began his suicide attempt, and took another minute to untie the ligature and lower Tavera to the ground. *Id.* at 8.

## II. Procedural History

On November 28, 2016, Plaintiff filed suit against Defendant, in his individual capacity, in this Court under 42 U.S.C. § 1983, alleging that Defendant's inactions related to Tavera's suicide constituted deliberate indifference and violated Tavera's Eighth Amendment rights.[1] *Id.* at 4. Because Defendant has since moved from Georgia to Texas, venue is proper in this Court under 28 U.S.C. § 1391(b)(1). Plaintiff has also filed a companion suit against Defendant's supervising officers in the Southern District of Georgia. *Arenas v. Georgia Dep't of Corr., et al.*, CV 4:16-320, 2017 WL 1754770, at *1 (S.D. Ga. May 3, 2017).

On November 29, 2017, Defendant filed his Motion for Summary Judgment. Docket no. 34. Plaintiff filed her response on December 22, 2017, and Defendant filed his reply on January 9, 2018. Plaintiff then filed a Motion to Strike certain evidence that Defendant used in his reply. Docket no. 46. The Court will first evaluate Plaintiff's Motion to Strike, then turn to Defendant's Motion for Summary Judgment.

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff asks the Court to "strike untimely evidence, a declaration of Steve Upton, that Defendant only provided in his reply brief to support his motion for summary judgment." Docket no. 46 at 1. Plaintiff argues that Defendant, in his reply, disclosed an undated declaration by GDOC Director of Operations Steve Upton, despite the fact that Upton appears in no prior

---

[1] As stated in the courts' March 20, 2017, Order (Docket no. 18), although Plaintiff's complaint alleges that Defendant is liable for violating Tavera's Eighth and Fourteenth Amendment rights, Plaintiff does not appear to invoke substantive rights under the Fourteenth Amendment. The Court reads the complaint as invoking the Eighth Amendment's guarantees against cruel and unusual punishment, which are made applicable to the states by operation of the Fourteenth Amendment. *See Hinojosa v. Livingston*, 807 F.3d 657, 654–55 n.5 ("The complaint invokes the Fourteenth Amendment simply because it is by that provision—and that provision alone—that the Eighth Amendment's guarantee applies against the States; the Eighth Amendment does not apply of its own force to the States.").

disclosures, has not been discussed in any depositions, and after Plaintiff had no idea Defendant would rely on Upton's testimony. Plaintiff asserts that the Court should strike Upton's declaration because Defendant presented an undesignated, undisclosed witness for expert testimony in his reply after the close of discovery. Plaintiff argues she has not had the opportunity to discover or evaluate Upton's statements and the basis for them.

In response, Defendant argues that after Plaintiff took depositions in the companion suit pending in the Southern District of Georgia, during which Plaintiff allegedly questioned the deponents about GDOC procedures that are inapplicable to this case, Plaintiff used testimony from those depositions as the meat of her response to Defendant's motion for summary judgment. Defendant asserts he had no choice but to use Upton's non-expert testimony in his reply brief because Upton is familiar with the meaning and application of the policy Plaintiff addresses. Defendant states he never identified Upton as a witness in initial or pre-trial disclosures because "Plaintiff never revealed in discovery the erroneous theory that was developed after Defendant filed his motion for summary judgment and that was employed for the first time in Plaintiff's opposition to the motion." Docket no. 47 at 2. Thus, Defendant argues, he did not know until Plaintiff's response was filed that Upton would be needed.

Under Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c). When considering whether to exclude evidence that was not properly designated, such as from an undisclosed witness, courts consider the following four factors: "(1) the explanation for the failure to identify the witness; (2) the

importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

After considering these factors, the Court finds that Upton's declaration should not be excluded. First, Defendant has explained his failure to previously identify the witness. Defendant states that Plaintiff deposed two defendants in the Georgia companion suit and asked about a standard operating procedure of the GDOC for the first time on December 11, 2017, which followed Defendant's October 31, 2017, deadline for filing Rule 26(a)(3) disclosures and the October 27, 2017, deadline for completion of discovery in this case. These depositions also followed Defendant's November 29, 2017, motion for summary judgment. Defendant contends that it was not until Plaintiff raised arguments about this standard operating procedure for the first time in her response brief that Defendant determined he needed to use Upton as a fact rebuttal witness. Plaintiff listed "GDOC Policy – Suicide Prevention (2005 Effective)" in her pre-trial disclosures, but she did not identify the specific standard operating procedure discussed in the response brief, and it is the interpretations acquired from the depositions taken in the companion case on that standard operating procedure that Plaintiff includes in her response brief. Given that these depositions on a specific procedure previously not raised in this case took place after Defendant filed his motion for summary judgment, Defendant has shown good cause for including Upton's declaration in his reply brief. Further, because Upton's declaration addresses arguments raised by Plaintiff in her response brief, the Court finds that Upton's declaration is important evidence to consider, but the Court will only consider it for the limited purpose of a fact rebuttal witness in response to Plaintiff's arguments.

Also, the Court finds the potential prejudice to Plaintiff is not high. Plaintiff contends that "the prejudice of allowing an allegedly disinterested 'expert' to testify is high." Docket no. 48 at 5. Plaintiff further contends that Upton's declaration is cumulative "and not so unique to justify allowing it" when compared to the declaration of Warden Stanley Williams, which was used as evidence in Defendant's motion for summary judgment. *Id.* at 4. Plaintiff states that "[t]he real prejudice, however, would be allowing Defendant to call an additional, undesignated (and unretained) expert who, unlike Williams, is not facing personal liability for the death of Plaintiff's son." *Id.* at 5. The Court does not decide today the admissibility of Upton's testimony at trial, only whether the evidence attached to Defendant's reply brief should be considered in support of Defendant's motion for summary judgment. As stated above, the Court will consider Upton's declaration only for the purpose of a fact rebuttal witness in response to Plaintiff's response brief, and thus, Plaintiff will suffer minimal prejudice, if any. Because the potential prejudice to Plaintiff is low, a continuance that will create substantial delay is not necessary. Accordingly, Plaintiff's motion to strike is denied.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.**   **Legal Standard**

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to

9

support an essential element of the non-movant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II. Application

Defendant argues he is entitled to summary judgment because there is no evidence that he was aware of a substantial risk that Tavera would commit suicide prior to the suicide, and when Defendant did discover the suicide attempt, the evidence demonstrates that he responded reasonably. Defendant also argues that he is entitled to qualified immunity.

### A. There is no genuine dispute of material fact that Defendant was not aware of a substantial risk that Tavera would commit suicide prior to the suicide.

Defendant argues that there is no evidence that he was aware of any risk of harm to Tavera prior to the suicide. Accordingly, Defendant argues that Plaintiff cannot establish Defendant violated the Eighth Amendment prior to Tavera's suicide.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places certain duties on prison officials, "who must provide humane conditions of confinement; . . . ensure that inmates receive adequate food, clothing, shelter, and medical care," and "take reasonable measures to guarantee the safety of the inmates." *Id.* If a prison official acts with deliberate indifference "to a substantial risk of serious harm to an inmate," that official violates the Eighth Amendment. *Farmer*, 511 U.S. at 828.

For an official to act with deliberate indifference to such a substantial risk, that official must be subjectively aware of that risk. *Id.* An official owes inmates protection from harm during confinement, but such an official can only be held liable under the Eighth Amendment if the official "had subjective knowledge of a substantial risk of serious harm . . . but responded with deliberate indifference to that risk." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). The correct standard is not whether the official "knew or should have known," but whether the official "gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Id.*

In sum, a plaintiff must show that the official "was aware of facts from which an inference of an excessive risk to the prisoner's safety could be drawn, and that the employee actually drew an inference that such potential for harm existed." *Anderson v. Dallas Cty. Texas*, 286 F. App'x 850, 860 (5th Cir. 2008). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). The

"failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Id.* (quoting *Farmer*, 511 U.S. at 838).

Defendant states that prior to his December 7, 2014, shift, he never saw Tavera or had any interactions with him. Docket no. 34-1 at 2. Defendant states that he was not aware of Tavera's mental illness or the fact that Tavera previously attempted suicide in 2008. *Id.* Defendant further states that he did not know why Tavera was placed in administrative segregation, other than the fact that the sheet outside of the cell said "pending investigation." *Id.* Defendant also states that, when doing rounds on the night in question, after Defendant asked Tavera how he was doing, although Defendant cannot recall Tavera's exact response, he does remember that "nothing about [Tavera's] response caused [Defendant] any concern or led [him] to believe that [Tavera] might be suicidal." *Id.* Plaintiff presents no evidence that disputes Defendant's contention that he had no knowledge of a substantial risk of Tavera's suicide prior to the actual suicide, and the video surveillance of the scene does not refute Defendant's statements. To the extent that Plaintiff argues Defendant violated the Eighth Amendment prior to Defendant discovering Tavera's suicide attempt, Plaintiff presents no evidence that Defendant subjectively knew of a substantial risk that Tavera would commit suicide. *See Smith v. Blue*, 35 F. App'x 390 (5th Cir. 2002) (finding no dispute of material fact that officer did not know of suicide risk where inmate was taken off suicide watch, inmate appeared to be doing well, and inmate did not say or do anything that would have made the risk of suicide "obvious" to officer). Accordingly, the Court finds that there is no genuine dispute of fact that Defendant had no subjective knowledge of a substantial risk of suicide.

   **B. There is no genuine dispute of material fact that Defendant's response to the suicide was not made with deliberate indifference.**

Next, Defendant argues that after he became aware of Tavera's suicide, he responded to the incident reasonably to where he did not violate the Eighth Amendment. Defendant states that when he discovered Tavera hanging from his cell, he then knew of a substantial risk of harm to Tavera. But Defendant argues he did not respond with deliberate indifference to that risk; rather, he reasonably responded to the risk of harm in light of a legitimate safety concern in the prison context.

A prison official who actually knows "of a substantial risk to inmate health or safety may be found free from liability if [the official] responded reasonably to the risk, even if the harm ultimately was not averted." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer*, 511 U.S. at 844). As previously stated, "[d]eliberate indifference is an extremely high standard to meet." *Domino*, 239 F.3d at 756. A plaintiff cannot meet this extremely high standard by only showing the officer acted negligently. *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000).

Defendant argues that after he discovered that Tavera was attempting suicide, he immediately took steps to help Tavera: he radioed for help four times right away, he retrieved a key he believed was for Tavera's cell, ran back to the control room for the correct key after he realized he had the incorrect key, and opened the cell door on Lt. Dickson's orders when there were four officers present. The cell door was opened almost seven minutes after Defendant initially discovered Tavera attempting suicide.

Defendant and the other officers then worked to remove Tavera from the noose and placed Tavera on the floor. While the other officers performed CPR on Tavera, Defendant videotaped the officers' efforts. Defendant argues this all occurred "in the context of a prison

officer constrained by policy—for legitimate security reasons—to call and wait for security backup before entering an inmate's cell in situations of this kind." Docket no. 34 at 16. Defendant contends that there is a legitimate safety risk when officers enter an inmate's cell, in part because inmates may fake or stage injuries to themselves to lure officers into a cell, and it would have been unreasonable and potentially unsafe for Defendant or any other officer in a similar situation to enter Tavera's cell alone. Defendant argues he responded reasonably by immediately calling for help, acquiring the key to Tavera's cell, opening the cell when ordered, and helped to remove Tavera from the noose.

Plaintiff, on the other hand, argues that Defendant did nothing but make radio calls and fill out some paperwork "during the essential seven minutes after he discovered Tavera." Docket no. 39 at 12. Plaintiff contends that Defendant did not respond reasonably to Tavera's suicide by only calling his supervisors and taking no physical action because this situation called for an immediate physical response, rather than to wait for backup.[2]

Plaintiff's arguments and the evidence provided regarding the actions that Defendant took amount to alleging that Defendant was negligent, or at most grossly negligent. But even evidence of gross negligence does not amount to deliberate indifference. *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 459 (5th Cir.2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."). In cases where a plaintiff claims deliberate indifference with respect to proper medical risk, for example, courts require a showing that a defendant "refused to treat [an individual],

---

[2] Throughout Plaintiff's response brief, she cites to language from the Court's March 20, 2017, order denying Defendant's motion to dismiss. In this prior order, however, the Court only considered the adequacy of Plaintiff's allegations to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Court taking Plaintiff's allegations as true at the motion to dismiss stage does not address the question of whether a genuine dispute of material fact exists.

ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 752 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

Plaintiff has presented no evidence that Defendant refused to respond to Tavera's suicide when he discovered it, ignored the suicide attempt, intentionally treated Tavera incorrectly, or acted in such a way to demonstrate a wanton disregard for the risk to Tavera's life. If Defendant had in fact "done nothing" after he discovered Tavera attempting suicide, this would present a genuine dispute of material fact as to whether Defendant acted with deliberate indifference. *See Pinchback v. Leon-Gomez*, No. 6:15-CV-805-RWS-KNM, 2017 WL 5632444, at *6–8 (E.D. Tex. Mar. 7, 2017), *report and recommendation adopted*, No. 6:15-CV-805-RWS-KNM, 2017 WL 5634636 (E.D. Tex. Mar. 22, 2017) (finding a genuine dispute of material fact as to whether a nurse acted with conscious disregard of serious risk to prisoner's health where there was a factual dispute if the nurse completely refused to treat the prisoner). But Plaintiff has only presented evidence that Defendant perhaps acted with negligence, or at most gross negligence, by taking actions that did not avert the threat to Tavera's life and that Plaintiff alleges were insufficient. Such evidence does not rise to the level of deliberate indifference. *See Hyatt v. Thomas*, 843 F.3d 172, 179–80 (5th Cir. 2016) (granting summary judgment and finding defendant acted reasonably, and not with deliberate indifference, when she responded to the prisoner's suicide risk by withholding means for self-harm, placed the prisoner under surveillance, and informed her relieving officer of a potential suicide risk). Plaintiff attempts to distinguish *Hyatt* by arguing that in *Hyatt*, the officer took "some, ultimately ineffectual, precautions" and that the officer was no longer in the jail facility when the suicide occurred.

15

Even so, the key finding in *Hyatt* that "while not ideal, [the defendant's] failure to exercise even greater care to avoid [the prisoner's] suicide did not amount to deliberate indifference" similarly applies to the present case.

Plaintiff also argues that a specific GDOC standard operating procedure required Defendant to immediately enter Tavera's to cut him down from the noose. The procedure, entitled "Managing Potentially Suicidal, Self-Injurious and Aggressive Behavior," states, "It is the policy of the [GDOC] that inmates/probationers who are potentially suicidal, self-injurious, and/or physically aggressive will be identified, and referred for further evaluation and/or appropriate stabilization/management." Docket no. 39-3 at 2. The procedure applies to "all State Institutions, Boot Camps, Transitional Centers, Probation Detention Facilities and County Institutions," but such institutions are only subject to the procedure "only to the extent that when a mental health crisis is suspected by staff the inmate/probationer will be transferred, as soon as possible, to an appropriate evaluating facility. . . for evaluation." *Id.* Under this procedure, if "an inmate/probationer is discovered hanging . . . staff will immediately initiate appropriate first-aid measures." *Id.* at 13. The procedure goes on to say that "[i]n the event that any inmate/probationer is found hanging, the correctional officer will call for backup by radio or telephone and then immediately cut down the hanging inmate/probationer and initiate CPR procedures." Plaintiff argues that, under this procedure, Defendant should have not only called for backup, but also immediately entered Tavera's cell to cut him down. Plaintiff submits as evidence the depositions of Lt. Dickson and Sgt. Shelby to support her argument that the policy required Defendant to immediately enter Tavera's cell. As stated above, however, this procedure applies to prisoners "who are potentially suicidal, self-injurious, and/or physically aggressive"

16

who will then "be identified, and referred for further evaluation and/or appropriate stabilization/management," and a facility is only subject to the procedure after a mental health crisis is suspected and a prisoner is transferred for evaluation. Plaintiff has presented no evidence that such was the case for Tavera, and thus, has presented no evidence that this specific standard operating procedure applied to Defendant when he discovered that Tavera was attempting suicide.

Plaintiff further argues that even if the facility's policy is to wait for backup before a single officer enters the cell, such a policy is dangerous and unreasonable. Plaintiff's arguments, however, still fail to evince that Defendant's actual actions amount to deliberate indifference. Although, as Plaintiff argues, Defendant stated in his deposition that he thought that Tavera was indeed killing himself, this does alter the analysis that the actions Defendant took in response to discovering Tavera did not amount to deliberate indifference. Plaintiff finally argues that there was no justification for Defendant to not immediately call 911 after he discovered Tavera hanging in his cell, even though Defendant knew Tavera would need outside medical attention as soon as possible. Plaintiff, again, offers evidence that Defendant was at most grossly negligent in his decision to not immediately call 911, rather than call for backup, enter the cell when ordered to, and assist in removing Tavera from the noose before CPR was performed.

As discussed above, deliberate indifference is an extremely high standard to meet. At most, Plaintiff only presents evidence of gross negligence. There is no dispute in the record that Defendant did more than "nothing," and the fact that the harm was not averted does not impose liability on Defendant. Plaintiff presents no evidence that Defendant refused to respond to Tavera's suicide when he discovered it, ignored the suicide attempt, intentionally treated Tavera

17

incorrectly, or acted in such a way to demonstrate a wanton disregard for the risk to Tavera's life. Although the parties dispute as to what the proper or ideal response to Tavera's suicide attempt may have been, there is no genuine dispute of material fact that Defendant did not act with deliberate indifference. The Court need not analyze Defendant's arguments on qualified immunity.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike (Docket no. 46) is DENIED, and Defendant's Motion for Summary Judgment (Docket no. 34) is GRANTED. Plaintiff's claims are hereby DISMISSED WITH PREJUDICE. The Clerk is directed to issue a Judgment in favor of Defendant, and that Plaintiff takes nothing on its claims. Defendant may submit its Bill of Costs within 14 days in the form directed by the Clerk should it desire to pursue these costs.

It is so ORDERED.

SIGNED this 13th day of February, 2018.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE